Filed 7/20/22  P. v. Greene CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCELLUS GREENE,<br><br>    Defendant and Appellant. | B315882<br><br>(Los Angeles County<br>Super. Ct.<br>No. ZM027029) |

APPEAL from an order of the Superior Court of Los Angeles County, David C. Brougham, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Marcellus Greene appeals from a commitment order classifying him as a sexually violent predator and committing him to the State Department of State Hospitals (SDSH), under the Sexually Violent Predator Act (Act) (Welf. & Inst. Code,[1] § 6600 et seq.), for an indeterminate term.  On appeal, Greene argues that his commitment cannot stand because there was insufficient evidence that he suffers from a severe mental disorder that predisposes him to commit sexually violent predatory crimes if released.  We disagree and affirm.

## BACKGROUND

### I.    The Act

The Act "allows for the involuntary commitment of certain convicted sex offenders, whose diagnosed mental disorders make them likely to reoffend if released at the end of their prison terms."  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 235.)  A sexually violent predator (SVP) is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."  (§ 6600, subd. (a)(1).)  Further, the offender's future sexually violent criminal behavior must be "predatory" in nature (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186), meaning that it is "directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization."  (§ 6600, subd. (e).)

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2

A person who is declared an SVP is committed to the SDSH for treatment. (§ 6604.) The Act is "not punitive in purpose or effect" (*People v. Yartz* (2005) 37 Cal.4th 529, 535), and a commitment proceeding under the Act is a " 'special proceeding of a civil nature.' " (*Id.* at p. 536.) To support a person's commitment under the Act, the People must prove beyond a reasonable doubt that the person is an SVP. (§ 6604; *Cooley v. Superior Court*, *supra*, 29 Cal.4th at p. 246.)

## II.    Greene's underlying offense

In 1996, Greene pleaded no contest to a violation of Penal Code section 289, sexual penetration with a foreign object with force or violence. The conviction stemmed from a July 1996 incident that began when the victim was on the phone and Greene had a telephone operator interrupt the victim's call. After the victim answered, Greene offered her candy, and she went over to his house. When she entered, Greene pulled down her underwear and she attempted to fight him off. She continued to fight and scream, and Greene turned up the music that he was playing. Greene threatened to anally penetrate her, but instead grabbed her by the throat and forced his penis into her vagina. Prior to doing so, Greene refused the victim's request that he use a condom. The victim left Greene's house and told a friend what had happened. The friend called the police.

## III.    The SVP proceedings

On July 1, 2015, the district attorney petitioned to commit Greene as an SVP. The trial court found probable cause to believe that Greene was an SVP and ordered a trial.

After Greene waived a trial by jury, a bench trial was held in September and October of 2021. Dr. Tricia Busby and

3

Dr. Christopher Matosich testified for the prosecution,[2] and Dr. G. Preston Sims and Greene testified for the defense.

## A. *The People's expert testimony*

### 1. Dr. Busby

Dr. Busby, a SDSH forensic evaluator, evaluated Greene. Dr. Busby reviewed the 1996 police report from the commitment offense, the abstract of judgment, Greene's rap sheet, state hospital treatment records, and the preliminary hearing transcript. She attempted to interview Greene multiple times but was unable to do so because he was considered dangerous and was confined to his unit.

Dr. Busby diagnosed Greene with exhibitionist disorder (i.e., becoming aroused by exposing oneself to unsuspecting strangers), schizoaffective disorder, bipolar type, antisocial personality disorder, and substance abuse disorder. The exhibitionist disorder diagnosis was premised upon a pattern of behavior beginning in 2007 of Greene exposing himself to unsuspecting female correctional staff, and masturbating while looking at them. Greene was convicted of indecent exposure in 2012 and 2018 based upon two of these incidents, one in prison and the other in the state hospital.

Greene's schizoaffective disorder diagnosis involved symptoms such as delusions, hallucinations, and disorganized behavior. More specifically, Greene called himself King Marcellus and an "Afrikan Warrior," and also displayed

---

[2] During the testimony, Greene, who appeared remotely, was seen walking around, exercising, or breathing loudly. At one point, Greene interrupted Dr. Busby's testimony, exclaiming "[t]his is fucking bullshit."

disorganized speech and manic symptoms such as agitation, depression, and a decreased need for sleep.

Greene's antisocial personality disorder involved a lack of empathy and disregard for lawful behavior beginning before Greene turned 15. Greene reported that at age 9, he received stolen property, and between 14 and 15, he trespassed several times. Greene's adult criminal history consisted of arrests for assault and exhibitionist behaviors. His rule violations while incarcerated were further manifestations of his antisocial personality disorder.

Greene's substance abuse disorders, pertaining to alcohol and cocaine, stemmed from his being found in possession of controlled substances while incarcerated, including prison-made alcohol, a straw and some white powder, and pills that may not have belonged to him.

These diagnoses, according to Dr. Busby, predisposed Greene to sexually violent behavior because he continued to act out sexually on an almost daily basis. Dr. Busby viewed Greene's behavior, including violating the rights of correctional staff, to unwanted letters and exposing behavior, as a continuation of his conduct surrounding the commitment offense, which the controlled environment only tempered. That Greene was not violent during these institutional encounters did not affect Dr. Busby's diagnosis of exhibitionist disorder.

Dr. Busby applied the Static-99R, an actuarial assessment of sexual offense risk that identifies risk factors found to be significantly associated with sexual recidivism. She obtained a score of seven for Greene, which indicated he was a high risk for sexual reoffense, with a 31 percent chance of reoffending within five years, and a 43 percent chance within 10 years. Dr. Busby

also applied a test that assessed dynamic risk factors, or risks that could be improved or mitigated with appropriate behavior and treatment. Greene was assessed at 20, meaning that he was in a high-needs treatment group. However, Greene did not partake in the treatment offered to him in the state hospital. Finally, Dr. Busby considered protective factors that might have reduced Greene's likelihood of recidivism, including advanced age, completion of sex offender treatment, and medical conditions.

Taking these factors together, and particularly in light of Greene's multiple diagnoses and his refusals to learn coping skills for his diagnoses through treatment, Dr. Busby concluded that Greene was likely to reoffend in a sexually violent predatory manner in the community. Dr. Busby explained that Greene's refusal to avail himself of treatment in custody rendered him unlikely to seek treatment at liberty. Greene's sexually aggressive behavior, a product of his schizoaffective disorder, his use of alcohol and drugs while in custody, and statements that he gets triggered by women, wishing to expose himself to staff in situations where they would not expect it, likewise supported Dr. Busby's conclusions.

Dr. Busby noted that Greene's qualifying offense was predatory because he sought the victim out and enticed her to come over. Nonetheless, she acknowledged that, according to the preliminary hearing transcript, Greene and the victim had a prior relationship, including having consensual sex on one occasion, and that the victim knew where Greene lived and voluntarily came to his residence.

### 2.    Dr. Matosich

Dr. Matosich, a clinical forensic psychologist who had completed over 1,200 SVP evaluations, conducted SVP evaluations on Greene in 2015, 2017, 2019, and 2021, and interviewed him in 2015 and 2021.  Before completing his evaluations, Dr. Matosich reviews probation and police reports, legal records, and institutional mental health and behavioral records, and he reviewed some of those records for Greene.

During Dr. Matosich's 2015 interview, Greene recalled that his first sexual contact, at age 11 or 12, "opened the floodgate" and was followed by more sexual encounters, two of which were in prison.  Greene admitted to 17 rule violations since 2012, but denied victimizing anyone in prison.  Most of his violations were for masturbating publicly or indecent exposure, but he was also accused of writing a love letter to a female correctional staff member, in which he invited her to take a bubble bath with him.  Greene attributed his incidents to his desire to explore his sexual fantasies, and that seeing a ponytailed woman chewing bubblegum made him horny.

When asked about fulfilling his sexual needs while in custody versus in the community, Greene stated it was his right to masturbate to prevent prostate cancer.  Greene used pornography while in custody.  According to Greene, exposing himself was his own right and his own business.  He got an adrenaline rush from doing so, finding it "exciting" to surprise someone by masturbating, claiming that he is in his "prime" when doing so.  Greene also claimed that officers had encouraged him to expose himself while in custody.

Greene recalled that he was first arrested at age nine for receiving a stolen VCR.  Greene was arrested for trespassing on

city property at ages 13 and 14, and again at 18.  In 2002, Greene received an additional eight-year sentence for having a weapon in prison.

Greene stated that he was wrongfully convicted because of the racism surrounding the O.J. Simpson case.  Greene planned to take legal action against the state based upon his illegal incarceration and against prison officers for refusing to move him away from predatory prisoners and conducting illegal strip searches.  He also planned to obtain his undergraduate and law degrees, open his own law firm as a way to assist people with publishing poetry, and to live until age 112.  Greene also stated he was in a romantic relationship with a woman he had not yet physically met.

Dr. Matosich interviewed Greene again in 2021.  At the time, Greene was going by the name "Marvelous Afrikan Warrior."  He had just been removed from the state hospital to prison for exposing himself.  Greene stated he was sexually frustrated, and his overall presentation was pressured and rapid.  His speech was unfocused and hard to follow.

Based upon these facts, Dr. Matosich diagnosed Greene with other specified paraphilic disorder, nonconsent, meaning that Greene had frequent fantasies, urges, and behaviors involving sexual activity with nonconsenting individuals, children, or objects.  Although this diagnosis was required to be present for at least six months, and Greene's diagnosis stemmed from the commitment offense, Dr. Matosich believed that Greene's spontaneous statement in 2015 that he enjoys controlling his partner uniquely qualified him.

Dr. Matosich also diagnosed Greene with exhibitionistic disorder in a controlled environment, in which an individual

experiences excitement or pleasure from surprising strangers with sexual behavior. Dr. Matosich attributed this to Greene's persistent rule violations and to his statements that surprising individuals as he is masturbating, both in custody and the community, was arousing to him.

Dr. Matosich further diagnosed Greene with bipolar disorder, moderate, with a recent episode of hypomania. Greene's loud and hostile tone, and specifically his incoherent thoughts and speech, during the two interviews accounted for this diagnosis. With respect to the 2021 interview, Dr. Matosich observed that Greene suffered from grandiosity within his bipolar condition and had goals and plans that were unrealistic or delusional. For example, Greene claimed that director Ava DuVernay would write a movie about his life and that he would have $5 million to donate.

Greene also met the criteria for antisocial personality disorder on account of his early onset of criminal behavior and inability to conform to community and institutional standards. Finally, Dr. Matosich diagnosed Greene with cocaine use disorder, moderate, in sustained remission in a controlled environment.

In Dr. Matosich's opinion, these diagnoses, working together, predispose Greene to sexually violent predatory criminal behavior. In particular, Greene's paraphilic disorder had become more severe because of issues related to his bipolar disorder and the need to express himself through exposure and anti-social personality characteristics and traits. Thus, although each disorder, standing alone, would constitute a qualifying diagnosis, the combination of those disorders created a greater risk for acting on Greene's paraphilic tendencies, urges, and

behaviors, and it was difficult to separate them out as causes for Greene's behavior.

Dr. Matosich also deployed the Static-99R, and scored Greene an "eight," placing him in the "well-above average" category of risk for reoffending. Dr. Matosich also utilized the structured risk assessment, which measured dynamic variables that are changeable through treatment and other interventions. Greene scored above "3," placing him in the high-risk group. This scoring included consideration of Greene's lack of emotionally intimate or continuous relationships with adults, his lack of emotional congruence with children, and his callousness and degree of psychopathy.

These reasons, combined with Greene's lack of insight and participation in treatment, formed the basis for Dr. Matosich's conclusion that Greene was likely to engage in sexually violent predatory criminal behavior in the community and needed to stay in a secured facility. Greene continued to be preoccupied with sexual behavior and believed he was entitled to follow through on his urges. He was more prone to sexually violent predatory behavior, rather than mere exhibitionism, in the community because of the severity of his sexual deviances, as well as his refusing treatment to address his delusions and grandiosity, entitlement, and aggression. Based on these factors, and the unique callousness and predatory nature of the commitment offense,[3] Dr. Matosich concluded that Greene would act consistent with the qualifying offense without treatment.

---

[3] Like Dr. Busby, Dr. Matosich concluded the commitment offense was predatory, even though Greene and the victim had a previous relationship, including having sex one time before the

10

## B.    *The defense case*
### 1.    Dr. Sims

Dr. Sims, an SDSH clinical and forensic psychologist, had conducted over 1,200 evaluations and testified approximately 100 times as an expert, 95 percent of the time for the prosecution.

Dr. Sims first evaluated Greene in 2015, reviewing several case documents and interviewing him for 90 minutes.  During that interview, Greene denied the commitment offense, as well as any substance abuse and mental health issues.  Greene claimed that he gave the victim her first penetrating orgasm.  Dr. Sims also evaluated Greene in 2021, reviewing previous evaluations, rule violation reports, and hospital records and Greene's writings before doing so.

After both evaluations, Dr. Sims concluded that Greene had mental disorders that predispose him to sexual criminal behavior, but not sexually violent or predatory acts.  Specifically, Dr. Sims diagnosed Greene with exhibitionistic disorder, schizoaffective disorder, cocaine and alcohol use disorders, and antisocial personality disorder.

Exhibitionistic disorder, Dr. Sims described, involves a sexual interest in exposing one's genitals to unsuspecting persons and actually doing so, causing interpersonal difficulty.  Greene repeatedly engaged in such behavior, but Dr. Sims did not consider it sexually violent because it does not involve physical contact.

Schizoaffective disorder combines the symptoms of schizophrenia and mood disorders such as depression or mania.

---

incident, and even though the victim voluntarily came to Greene's residence at his invitation.

11

Though Dr. Sims did not observe any such evidence during his 2015 interview, he relied on hospital records describing symptoms that Greene exhibited matching that diagnosis, including delusions, depression, mania, and disorganized thoughts and speech. Symptoms were also described in the transcript of Dr. Matosich's 2021 interview.

Despite these diagnoses, however, Dr. Sims did not believe that any criminal sexual acts by Greene would be violent or predatory. This was because the vast majority of Greene's criminal sexual behavior were acts of indecent exposure, having only committed one sexually violent predatory offense in 1996. Dr. Sims noted that the majority of sex offenders have a relatively low risk of sexually reoffending, in part because they are motivated to stay out of prison. Though Greene had been continuously incarcerated or institutionalized since his 1996 conviction, he could have committed a contact offense in prison or the hospital, but had not done so, instead merely exposing himself to various staff members. Because most persons do not reoffend after their initial incarceration, Dr. Sims opined that there is no reason to say with any degree of certainty that Greene would similarly reoffend. Moreover, if a person is sexually aroused based on lack of consent, that person would be expected to have reoffended after receiving a criminal sanction, which was not the case with Greene.

Dr. Sims evaluated Greene using the Static-99R, Static-2002R, and two dynamic instruments, the Structured Risk Assessment Forensic Version, and the Hare Psychopathy Checklist (also known as the PCLR). Greene received a "seven" on both the Static-99R and Static-2002R, placing him in the "well above average" risk category, or the highest level of possible

12

recidivism risk. His structured risk assessment score was 3.3, placing him in the highest risk category. Greene's PCLR score was in the higher average range (22.1 out of 40 points). In Dr. Sims's view, however, these instruments had limited value in assessing whether one qualifies as an SVP, because they measure only sexual recidivism generally, rather than the risk of committing sexually violent offenses.

This consideration, combined with Greene's only having committed a single sexually violent predatory offense in 1996, suggested that he was not a serious and well-founded risk for committing a violent predatory sexual offense in the future. Dr. Sims acknowledged, however, that he could not recall submitting an evaluation supporting an SVP finding where the subject only had one sexually violent offense. Dr. Sims further conceded that Greene remained at high risk of committing a nonviolent sexual offense, and was unlikely to pursue treatment upon release.

### 2.    Greene

Greene began his testimony stating, "I, marvelous Afrikan Warrior, am making a special limited appearance on behalf of the defendant, who is right here, Marcellus Alexander Greene, Sr."

Greene met the victim while they were enrolled in a substance abuse program. The victim called Greene the first night she got out of the program, and they went out on a date that ended in consensual sex.

Five days later, the night of the incident, Greene used an emergency breakthrough to tell her he had candy for her. When the victim arrived, Greene said he would meet her in the bedroom, where the candy was located. The victim agreed and told Greene "[d]on't take long."

In the bedroom, Greene, who had a bad day because he was found academically ineligible at school, attempted to kiss the victim. When she refused, he told her he would masturbate instead. As Greene started to ejaculate, the victim told him that she wanted to suck his penis, but Greene refused because she didn't want to have sex earlier. He then pushed her off the bed, finished ejaculating, and went into the bathroom. Greene denied having sex with the victim, but acknowledged holding her down by the neck as he was masturbating.

Greene denied other incidents with nonconsenting sexual partners, being aroused by having nonconsenting partners, or that he said as much to Dr. Matosich. No crime occurred in 1996; rather, his 1996 counsel coerced his plea.

Greene admitted to masturbating and exposing himself in the presence of institutional staff, but denied being turned on by it, claiming that he and other prisoners did so to identify the "good" staff members, and that it was an "adrenaline rush." Greene acknowledged refusing treatment while institutionalized, calling it a "farc[e]" and reasoning that he did not have sex with children. He did, however, participate in some sex offender treatment prior to the pandemic.

Upon release, Greene planned to reside in South Carolina with his future wife and engage in sex offender treatment there. During the two months in his current unit, he had not engaged in any indecent exposures. He denied having a sexual disorder or that he would sexually act out while at liberty, explaining that he will have a "loving wife that's waiting for me." While acknowledging his prior cocaine addiction, he disavowed using alcohol or any current addiction, and did not anticipate substance abuse problems after being released.

## C.    *The trial court's SVP finding and commitment order*

After hearing argument from counsel, the trial court issued its finding and commitment order.  The court held that the People had proven beyond a reasonable doubt that:  (1) Greene had been convicted of a sexually violent offense; (2) Greene had diagnosed mental disorders, and, as a result, poses a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior; and (3) it was necessary to keep Greene in custody to ensure the health and safety of others.

Addressing whether Greene's diagnoses predispose him to sexually violent predatory criminal behavior, the trial court found the testimony of Dr. Busby and Dr. Matosich persuasive based on the thoroughness of their evaluations, interviews, and review of underlying documents.  Though acknowledging Dr. Sims's extensive qualifications, the trial court found his testimony less credible in light of his reluctance to qualify an individual as a SVP without a repeat offense.

The trial court declared Greene an SVP and committed him to the state hospital for an indeterminate term.  Greene timely appealed.

## DISCUSSION

Greene acknowledges that the People demonstrated beyond a reasonable doubt that his severe mental disorders predispose him to commit criminal sexual acts, but contends that reversal is nonetheless required because the People failed to show that such acts will be violent and predatory.  Though two analytically distinct arguments, Greene's complaints, boiled down, are alike: the trial court afforded undue weight to—or otherwise

15

misconstrued—certain facts of the decades-old commitment offense in concluding that the People met their burden as to these prongs.  Contrary to Greene's contentions, the People's expert testimony, together with the actuarial tests they performed, Greene's statements, conduct in custody, and refusals of treatment, among other considerations, provide substantial evidence to support the trial court's findings.

## I.     Standard of review

"In reviewing the evidence sufficient to support a commitment under section 6600, 'courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction.' [Citation.] 'Thus, [the appellate] court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below.  [Citation.]  To be substantial, the evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible and of solid value.' " ' " (*People v. Carlin* (2007) 150 Cal.App.4th 322, 333.)

Further, " 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' [Citation.]  This is true even in the context of expert witness testimony." (*People v. Poulsom* (2013)

16

213 Cal.App.4th 501, 518; accord *People v. Sumahit* (2005) 128 Cal.App.4th 347, 352.)[4]

## II. Substantial evidence supports the trial court's determination that Greene's mental disorders predispose him to violent and predatory criminal sexual acts.

As noted, an SVP adjudication requires a diagnosed mental disorder that renders one likely to engage in sexually violent and predatory criminal behavior.  Substantial evidence supports the trial court's conclusion that the "violent" and "predatory" requirements were satisfied here.

All three experts—including the defense expert—diagnosed Greene with mental disorders that, in their totality, predisposed him to committing another sex offense.  Their opinions departed only on the matter of whether such offense would be violent and predatory.  Greene primarily contends that the trial court erred in concluding any future criminal acts would be violent and predatory by relying exclusively on the facts of Greene's commitment offense and diagnoses.  The record belies that assertion.

For example, Dr. Busby's diagnoses of exhibitionist disorder, schizoaffective disorder, antisocial personality disorder, and substance abuse disorders predisposed Greene to sexually violent and predatory behavior because he continued to act out in a sexual manner on a near daily basis.  That Greene's institutional misconduct, a product of his schizoaffective disorder and antisocial personality disorder, was not violent or hands-on

---

[4] We reject Greene's implication that we are required to substitute our judgment for that of the trial court.

did not alter her opinion because the controlled environment tempered his behavior. Dr. Busby's conclusions were premised upon her consideration of extensive documentation relating to both the commitment offense and Greene's subsequent history, including his refusals of treatment, his substance abuse while in custody, and his statements that women trigger his desire to surprise them by exposing himself.

Dr. Matosich similarly concluded, after review of extensive documents and interviews with Greene, that Greene suffered from other specified paraphilic disorder, exhibitionist disorder, bipolar disorder, antisocial personality disorder, and cocaine use disorder. These present mental health diagnoses rendered him prone to violent conduct, rather than mere exhibitionism, because of the severity of his sexual deviances and preoccupations, and his refusing to accept treatment to address his delusions and grandiosity, entitlement, and aggression. These diagnoses and clinical observations, combined with the uniquely callous nature of the commitment offense, led Dr. Matosich to conclude Greene would similarly reoffend if released without treatment.

After interviewing Greene and reviewing numerous case and institutional documents, Dr. Sims concurred with the diagnoses of exhibitionist disorder, schizoaffective disorder, cocaine and alcohol use disorder, antisocial personality disorder, and further agreed that these predisposed Greene to commit criminal sexual acts. Nonetheless, because most of Greene's past sexual misconduct was not violent, Sims was uncertain that Greene would reoffend in a violent and predatory manner. Still, Dr. Sims joined Dr. Busby and Dr. Matosich in concluding that

18

Greene was in the high range of risk of reoffending based on his use of actuarial tools and analyses of dynamic risks.[5]

As such, the multiple clinical evaluations, the results of several standardized tests, and the evidence of Greene's conduct while confined (ranging from additional sex offenses to refusing treatment), supported the trial court's conclusion that Greene posed a present risk of sexually violent recidivism. (§ 6600, subd. (3) [evidence of "currently diagnosed mental disorder" rendering one likely to engage in sexually violent criminal behavior is required].) Indeed, as Greene acknowledges, the trial court afforded extensive consideration to his lack of a contact offense in custody, noting that he was "not completely unable but far less able" to engage in sexually violent offenses. The court thus implicitly credited Dr. Busby's reasoned prognosis, echoed on the whole by Dr. Matosich, that Greene was likely to violently reoffend irrespective of the lack of additional sexually violent misconduct over Dr. Sims's contrary conclusion. (See *People v. Sumahit*, *supra*, 128 Cal.App.4th at p. 353 [prognosis often must account for more mild misbehavior in "controlled hospital environment"].)

Greene's argument, therefore, amounts to an invitation to reweigh the evidence, which "confuses our task in a substantial evidence review." (*People v. Poulsom*, *supra*, 213 Cal.App.4th at p. 526.) Because the test is only whether there is substantial

---

[5] While Greene correctly asserts that these tools measure generalized sexual conduct, rather than violent recidivism, they are nonetheless commonly utilized devices that, when considered together with other evidence of the kind presented here, courts have accepted as predictive of violent sexual behavior. (*People v. Roa* (2017) 11 Cal.App.5th 428, 445.)

evidence supporting the factfinder's conclusions, we are not concerned with contrary evidence or inferences that a party urges should have been drawn from that evidence. (*Id.* at p. 527.) Dr. Sims's testimony was found not credible by the trial court because he was hesitant to qualify an individual as an SVP without a repeat offense. We "are not free to reweigh or reinterpret the evidence." (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466–467.)

Nor do we fault the trial court's conclusion that any future criminal behavior was likely to be predatory, i.e., "directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).) Greene seeks to undermine that holding by arguing that the commitment offense was not predatory, and, in any event, occurred far too long ago to have the heavy predictive value that the trial court and expert witnesses allegedly afforded it. These arguments are unconvincing.

First, it is well established that the commitment offense need not be a predatory act. (*People v. Torres* (2001) 25 Cal.4th 680, 684 [spousal rape would rarely be predatory under the Act].)[6] Second, Greene's argument suffers from the same

---

[6] We therefore need not reach the issue, but Greene's claim that the commitment offense was not predatory is dubious. Greene and the victim met just two months before the incident, having gone on one date that ended in consensual sex a mere five days prior the incident. The incident began with Greene using an emergency breakthrough call to coerce the victim to come to his house with candy. Because this inquiry focuses upon whether

infirmity outlined above:  the court had a far more expansive record before it than merely the facts of the commitment offense.

Accounting for the testimony of two experts, the results of the tests they conducted, Greene's statements, as well as his conduct in custody, there was substantial evidence for the conclusion that any further offenses were likely to be predatory. (See *People v. Orey* (2021) 63 Cal.App.5th 529, 563 [sufficient evidence where jury relied on testimony of two experts and defendant's refusal of treatment].)  Considering Greene's sexual aggression toward unsuspecting facility personnel and his statements that the surprise nature of those interactions motivated his actions, the conclusion that Greene would push the envelope without supervision had ample evidentiary support. (See *People v. Sumahit*, *supra*, 128 Cal.App.4th at p. 353.) Greene's refusals of treatment only buttressed the conclusion that he lacked any structure for controlling his impulses upon release (see *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 929 [noncompliance with treatment indicative of lack of preparedness to voluntarily control impulses upon release]), and

---

potential victims could become "aware of the defendant's status as a sex offender" (*People v. Hurtado*, *supra*, 28 Cal.4th at pp. 1187–1188), the brief period of Greene's interactions with the victim—the vast majority of which was confined to a rehabilitation center—suggests that Greene and the victim were at most "casual acquaintance[s] with whom no substantial relationship exists" (§ 6600, subd. (e)).  Thus, Greene's further attempt to cast doubt upon the testimony of the prosecution's experts by arguing they failed to fully consider Greene's relationship with the victim is not just an improper request to reweigh the evidence (*People v. Mercer*, *supra*, 70 Cal.App.4th at pp. 466–467), but a meritless one.

his outbursts and unbalanced testimony during the trial proceedings did not aid his cause.

Drawing all reasonable inferences in favor of the order, we are satisfied that substantial evidence supports the trial court's findings.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


KIM, J.*


We concur:


EDMON, P. J.


LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.